**Anthony T. LEE et al., Plaintiffs,**

**United States of America,
Plaintiff-Intervenor,**

**National Education Assoc.,
Plaintiff-Intervenor,**

v.

**MARENGO COUNTY BOARD OF
EDUCATION et al., Defendants.**

Civ. A. No. 5945–70–H.

United States District Court,
S. D. Alabama, N. D.

Aug. 7, 1978.

Solomon S. Seay, Jr., Montgomery, Ala., and Jack Greenberg, NAACP Legal Defense Fund, New York City, for plaintiffs.

Solomon S. Seay, Jr., Montgomery, Ala., for Nat. Ed. Ass'n.

Franz R. Marshall, and Joshua P. Bogin, Dept. of Justice, Ed. Section, Civil Rights Division, Washington, D. C., for United States of America.

Hugh A. Lloyd, Demopolis, Ala., for Marengo County Bd. of Ed.

HAND, District Judge.

This matter is presently submitted for the Court's consideration of the motion for supplemental relief filed on April 4, 1977 by the intervenor United States of America. The Court heard testimony and received various articles of documentary evidence at the hearing in Selma, Alabama, on May 8,

---

1978. The Court, having considered such testimony and evidence, the post-trial memoranda of law filed by counsel for all parties, and the depositions on file with the Court, together with the applicable law, finds as follows:

## FINDINGS OF FACT

1. Marengo County Board of Education [hereinafter Board] was an original party defendant in the state-wide litigation of *Lee v. Macon County Board of Education,* 292 F.Supp. 363 (M.D.Ala.) (three judge panel), instituted in the last 1960's. At the time this lawsuit was filed the Board operated a dual school system perpetuating segregation of the races by providing completely separate educational facilities for white students and black students.

2. A decree entered by the three judge panel on March 22, 1967 permanently enjoined state officials from discriminating on the basis of race in the operation and conduct of the public schools in Alabama.[1] In response to this, the Board adopted a freedom of choice program by which students were allowed to elect the school that they would attend (Plan of April 6, 1967). On August 28, 1968 a majority of the three judge panel[2] entered a decree denying the plaintiffs' motion for abandonment of the freedom of choice policy, ordering the acceleration of faculty desegregation, and ordering the closing of certain Negro schools. A later order of the panel found that the Board was in substantial compliance with this order (Order of December 16, 1968).

On August 6, 1969 the panel ordered the United States to file a plan whereby the dual system then existing in Marengo County might be effectively and completely disestablished. The plan was filed on December 1, 1969 and the Board was ordered to show cause why such plan ought not be implemented. On June 12, 1970 the Court entered its terminal order adopting the desegregation plan under which the Board was to operate[3] and transferred the case to this Court.

3. The desegregation plan accepted by the three judge panel called for the division of Marengo County into three separate school zones:

(a) Zone 1: This zone comprises the southwest area of Marengo County. It is boarded by Choctaw and Clarke Counties to the West and South, and by the other two zones to the North and East.[4] The feeder schools of Sweetwater, Coxheath, Putnam and Myrtlewood were in this zone. Coxheath was to encompass grades 1 to 3, Sweetwater grades 4 to 7, and Putnam and Myrtlewood were to be used for other educational purposes. High school students (8–12) were to attend Marengo High School.

(b) Zone 2: This zone comprises the eastern area of Marengo County. It is bordered by Wilcox and Perry Counties to the East, and by Hale County to the North. The western boundary bordered on zones 1 and 2. This zone included the feeder schools of Marengo County Training (1–9) and Faunsdale (1–6), with high school students attending Marengo County High School (10–12).

(c) Zone 3: This zone comprises the northwestern area of Marengo County. It is bordered by zones 1 and 2 to the South

---

1. The defendants were required by the decree to "take affirmative action to disestablish all state enforced or encouraged public school segregation and to eliminate the effects of past state enforced or encouraged racial discrimination in their activities and their operation of the public school systems throughout the State." (Decree of March 22, 1967, p. 2). Marengo County was among the systems required by the decree to adopt a desegregation plan for the 1967–68 school year (*id.,* at p. 7), and the three judge panel's proposal (*id.,* Exhibit A) conceived the freedom of choice plan later instituted in Marengo County.

2. Circuit Judge Richard Rives and District Judge Frank Johnson authored this decree.

3. The plan adopted by the panel was, for the most part, that of the United States Office of Education, but the panel added provisions concerning faculty assignment, majority to minority transfers, and other matters.

4. Zone 1's eastern boundary touches briefly on the Wilcox County line.

and East, by Choctaw and Sumter Counties to the West, and by Greene and Hale Counties to the North. Jefferson and Palmetto were the feeder schools for this zone, with John Essex High School as the high school facility.

Beyond the student assignment plan, the desegregation plan touched on other areas:

(a) Faculty assignment; [5]

(b) Transportation—"bus routes and the assignment of students to buses will be designed to insure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis."

(c) School construction and site selection—all construction or selection to be "done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented."

(d) Majority to minority transfer policy—such transfers required to be allowed; and

(e) Attendance outside the system of residence—permissible where such transfers are allowed on a non-discriminatory basis, unless the cumulative effect of such transfers will either reduce desegregation in either district or reinforce the dual school system.

4. On August 5, 1970, this Court modified the foregoing plan in the following respects:

(a) Student Assignment: In Zone 1, Marengo High School and the Sweetwater-Coxheath complex were both to house grades 1–12; [6] in Zone 2, Marengo County High and Marengo County Training (Amelia Love Johnson High School) were to house grades 1–12, while Faunsdale housed grades 1–6; [7] in Zone 3, the desegregation plan was not sought to be modified.

(b) Faculty Desegregation: Employment, reassignment, and transfers were to be done on a non-discriminatory basis on requirements and qualifications not related to creed or race.

These modifications were rejected by the Fifth Circuit on June 15, 1971, when it vacated and remanded the case to this Court for implementation of a constitutional plan of student assignment and for conformity of faculty assignment to the mandate of *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211, 1219 (5th Cir. 1969).

5. On June 17, 1971 the Board was ordered by this Court to comply with the mandate of the Fifth Circuit by adopting a desegregation plan compatible with the rules set out in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) and *Singleton, supra,* and the Board was required to file semi-annual reports to the Court similar to those required in *United States v. Hinds County School Board,* 433 F.2d 611, 618–19 (5th Cir. 1970). This prompted the amended plan by the Board by which students would be exposed to one or two desegregated classes per day, but, for the most part, the schools themselves would remain racially segregated. [8] The District Court accepted this plan on August 30, 1971, but the Fifth Circuit rejected the plan, *Lee v. Macon County Board of Education,* 465 F.2d 369 (5th Cir. 1972), ordering that the previously proposed HEW plan be implemented unless the Board either produced a more effective plan or demonstrated the unworkability of the HEW plan.

---

5. The panel required, for the most part, compliance with the faculty and staff provisions set out in *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir. 1970).

6. In this zone, the Putnam School was to be closed and consolidated with the Sweetwater-Coxheath complex. The Myrtlewood School was to be closed and its students were to be sent to the Linden City School System. Some interchanging was to occur on the Sweetwater and Coxheath campuses, since most subjects were offered only at one or the other.

7. Pupils from the two high schools were to interchange campuses for required subjects and extracurricular activities that were offered at only one campus.

8. The Board proposed in Zone 1 to convene all students in all grades at one school for one required class, then to return them to their respective schools. The same proposal was advanced for students in Zone 2.

Thereafter, by an order dated September 14, 1972, this Court directed the Board to implement the desegregation plan proposed by the HEW office of education for Marengo County schools.

6. On November 16, 1972 the Board filed a new proposed desegregation plan that provided for the acceptance of black students in the two predominately white facilities (Sweetwater and Marengo County High) up to the maximum capacity of such facilities. The plan would alter Sweetwater from 95% to 73% white and Marengo County High from 95% to 77% white. After a hearing and on stipulation by the parties, this Court entered an order on July 16, 1973 adopting the plan under which the Board now operates.

This plan retained the zones drawn by HEW. In Zone 1, Marengo County High School was to continue to serve grades 1–12, as was Sweetwater High School. In 1973–74 students in grades 1–6 were to be assigned in such a manner that Sweetwater was 35% black. In 1974–75 grades 1–6 at Sweetwater and Coxheath were to be paired, with three grades at each school. In grades 10–12 there was to be no duplication of required courses at the two campuses, but rather the required courses were to be equitably allocated between the two schools. There was also to be no duplication of courses in grades 7–9 between Coxheath and Sweetwater. In Zone 2, the same mandate with respect to duplication of courses and equitable allocation of courses applied to grades 9–12 and 7–8. In 1973–74 students in grades 1–6 were to be assigned in such a manner that Marengo County High School was 35% black in those grades. Grades 1–6 in Marengo County High School and Marengo County Training (Amelia Johnson High School) were tentatively to be paired for the 1974–75 school year. No alterations were made in the HEW plan for Zone 3. The Court made no changes in the HEW plan with respect to faculty assignment, majority to minority transfer, transportation, school construction and site selection, or attendance outside the zone of residence, but the Court did require the filing of semi-annual reports similar to those required by *Hinds County, supra.*

The student assignment portion of the plan was amended by a consent order on September 6, 1974 to provide that all courses in grades 7–9 (other than vocational subjects) at Sweetwater and Coxheath were to be taught at the Coxheath campus, with all faculties similarly transferred, that the combined students of Marengo and Sweetwater High Schools be broken down into integrated sections for the teaching of required high school courses,[9] that grades 1–6 at Coxheath be closed with students therein to attend Sweetwater, that students from the Marengo High area attending grades 1–6 at Sweetwater have the option of attending 1–6 at Marengo, that all courses in grades 7–8 and all required and vocational courses in grades 9–12 at Marengo County High and Marengo County Training (Amelia Johnson High School) were to be allocated so that entire grades would be bussed at one time with the combined students of both schools to be broken down into integrated sections, and that Faunsdale and Palmetto Elementary Schools be closed with the students therein assigned to other schools within the zone or in the Linden City School System. The Marengo County schools have been operated and maintained under the terms of this amended plan since 1974.

7. On February 10, 1977, this Court determined that the Marengo County School System had been desegregated and unitary in nature, if not since the 1970 terminal order, then at least since July 16, 1973. The United States' objections to this determination were overruled as coming too late, and the decision was not appealed.

8. On April 4, 1977, the government filed the motion for supplemental relief that is presently before the Court. In the motion the government requests that the Court order the defendant Board to develop, adopt, and implement a new plan of

9. Such a plan required the bussing of entire grades from one school to the other, but the effect was to eliminate any course duplication in required or vocational courses.

student and faculty assignment to effectively desegregate the public schools operated by the Marengo County Board of Education in order that they might be brought into compliance with the constitutional standards set out in *Swann, supra,* and *Cisneros v. Corpus Christi Independent School District,* 467 F.2d 142 (5th Cir. 1972). As a basis for the relief requested, the government makes the following allegations:

(a) The Board operates overlapping transportation routes for schools of like grade structure, thereby maintaining the racial identities of the affected schools;

(b) The Board operates overlapping transportation routes for both the Marengo County and the Linden City School Systems, thereby aiding in the maintenance of the dual system in both districts;

(c) The Board operates segregated classrooms based on race;

(d) The Board has failed or refused to comply the the course-sharing provisions of the 1973 and 1974 orders of this Court with respect to classes at Sweetwater and Marengo High Schools and at Marengo County High School and Marengo County Training School (Amelia Love Johnson High School);

(e) The Board assigns its faculty to schools so as to reflect the race of students in attendance at each school; and

(f) Educationally sound, administratively feasible, and constitutionally proper alternatives are available to effectuate the desegregation of Marengo County schools.

For purposes of clarity, continuity, and convenience, the Court has elected to enter separate findings with respect to each allegation made by the government.

### A. Transportation

9. The Marengo County Board of Education maintains and operates transportation routes both for its own system and for the Linden City School System. *See Lee v. Linden City School System,* Civil Action No. 5945–70–H (S.D.Ala., July 13, 1978). Responsibility for implementation of the routes is vested jointly in Marengo County Superintendent Fred Ramsey and Linden City Superintendent Paul Whitcomb.

10. The government's first allegation with respect to the Board's transportation policies is that the Board has operated "overlapping transportation routes for schools of like grade structure, which has the effect of maintaining the racial identities of the affected schools." (Motion for Supplemental Relief, April 4, 1977).

11. On the question of overlapping routes, the government relies almost exclusively upon transportation maps furnished by the defendants to the government that depict the routes followed in the various zones (intervenor's Exhibits 20–24).

Intervenor's Exhibits 20 and 23 consist of two maps depicting the transportation routes utilized with respect to Marengo High School and Sweetwater High School, respectively. Exhibit 20, relating to routes going to Marengo High, shows that most routes are in the southwest corner of the county. However, bus number 126 originates in the southeast corner of the county and, after picking up several students in that area, proceeds directly past Sweetwater High and picks up students in that area on the way to Marengo County High. Exhibit 23, relating to routes going to Sweetwater High, shows that such routes encompass the entire southern area of Marengo County. The Sweetwater buses travel most of the same roads used by the Marengo buses and stop in many of the same areas. There are Sweetwater buses that drive directly past Marengo High School. Indeed, many students living within one mile of Marengo High are transported to Sweetwater High, and two Sweetwater routes actually originate in Dixon's Mill, where Marengo High is situated.

Intervenor's Exhibits 21 and 24 reflect the routes employed for the transportation of students to the Zone 2 schools. Exhibit 21 reflects the routes going to Marengo County High in Thomaston. Initially, it is clear that the Marengo County High routes overlap with the Marengo High routes in the areas of Magnolia, Hampdon, and

Moores Valley in the southwest corner of Marengo County. Such students are clearly within Zone 2 by virtue of assignment zone lines previously drawn by this Court, so the Marengo High buses are clearly transporting Zone 2 students to Zone 1 schools. At the other end of the county Exhibit 21 reveals that students from the John Essex zone (Zone 3) are being transported to Marengo County High. This is evidenced by the fact that bus number 139 picks up students in the areas of Old Spring Hill, Alfalfa, and the outskirts of Demopolis, all of which are in the John Essex zone. Such transportation, since it is composed mostly of white students, is in violation of prior orders of this Court. Additionally, such routes overlap with routes utilized in Zone 3. Finally, testimony of one bus driver who transports to Marengo County High revealed that all 64 students on her bus are white (deposition of Ruth Allen, intervenor's Exhibit 5 at page 11), an unlikely result in a system that is 80% black. Exhibit 24 reflects the routes utilized to transport students to and from Amelia Johnson High School in Thomaston. The only impropriety revealed by this Exhibit is the fact that 31 students from the Shiloh area, a Zone 1 area that is served by both Marengo and Sweetwater routes, are being transported to Johnson High School in Zone 2. This is in violation of the terms of the prior court orders in that it fails to respect the assignment zone lines previously drawn and overlaps with other routes. Beyond this, the Court finds no impropriety revealed by the Johnson routes.

Exhibit 22 reveals the routes utilized in Zone 3. All of these routes are within Zone 3 and are proper, the only overlap being the Marengo County High bus, mentioned above, that has been transporting from outside of Zone 2.

12. From the evidence adduced by intervenor's Exhibits 20–24, it is clear that the defendant Board is in violation of prior court orders in some respects of its transportation policies. The transportation of students residing in one zone to a school in another zone must cease. The evidence is clear that such students could just as easily be transported to a school in their attendance zone and that the utilization of such out of zone routes imposes additional economic burdens on the Board that need not exist. An additional consideration, in view of the deposition of Ruth Allen, *supra*, is segregation of the races aboard the buses. There is no direct evidence that this resulted from Board policy, but the implication drawn from the figures is a strong one. Further, the Board put on no evidence to explain this situation.

13. The second contention of the government with respect to Board transportation policies is that the Marengo County routes overlap with those of the Linden City School System to the extent that maintenance of the dual system in both districts is aided. Although intervenor's Exhibit 25 indicates that some overlapping between such routes is occurring in the town of Jefferson, the government has elected to abandon this contention in view of its interest in the remedy available in the case of *Lee v. Linden City School System,* Civil Action No. 5845–70–H (S.D.Ala.). *See* intervenor's post-trial brief, at page 6 n. 5 (May 30, 1978). In view of this, the Court enters no finding with respect to the alleged overlapping between Zone 3 routes and Linden City routes.

### B. Segregation of Classrooms by Race

14. Although the government raised this issue in its April 4, 1977 motion for supplemental relief, no evidence was put on concerning such segregated classrooms and the contention was not advanced by either the pre-trial or the post-trial briefs of the government. The complete lack of evidence requires a finding by the Court that the government has also abandoned this contention.

### C. Course-Sharing

15. As mentioned above, the consent order of September 6, 1974 required the Board to pair required courses between Marengo High School and Sweetwater High School in Zone 1 and between Marengo

County High School and Amelia Love Johnson High School in Zone 2, and to pair all courses in grades 7 and 8 in Marengo County High and Johnson in Zone 2.

16. In response to this consent order, the Board has adopted programs that can be characterized only as salutary at best. The programs in effect in the two zones require separate consideration:

(a) Zone 1—The precise language of the 1974 consent order with respect to this zone is, in pertinent part, as follows:

> All provisions of the July 16, 1973 order governing desegregation in grades 7–12 will remain in full force and effect under this Order.[10] However, to facilitate the elimination of course duplication in grades 7–9 between Coxheath Junior High and Sweetwater beginning in 1974–75, all classes for grades 7–9 at Sweetwater and Coxheath, with the exception of vocational subjects will be taught on the Coxheath campus. Faculty presently assigned to grades 7–9 at Sweetwater will be assigned to Coxheath.
>
> To facilitate the elimination of course duplication in required and vocational courses in grades 10–12 between Sweetwater High and Marengo High, beginning in 1974–75 entire grades will be bussed one time and the combined students of both schools in that grade will be broken down into integrated sections of not more than 35 students to each section.

The program actually initiated by the Board in this zone varied significantly from the terms of this court order. Initially, it is clear that the Board employed course-shar-

ing on a voluntary basis, with each student having the option whether he or she wished to participate (deposition of Marcus Walters, intervenor's Exhibit 16, at p. 20; deposition of J. J. Evans, intervenor's Exhibit 4, at p. 24). The understanding of one principal charged with implementation of the program[11] was that the purpose of the bussing was to achieve a 50%/50% racial balance in certain classes. (Walters' deposition, intervenor's Exhibit 16, at p. 16).

The program adopted in Zone 1 called for the bussing of classes of Marengo High students to the Sweetwater High campus for certain required courses, and classes of Sweetwater High students to the Marengo High campus for other required courses.[12] Once the composite classes were situated, team teaching was employed—the composite class was taught, alternately, by a Sweetwater teacher and a Marengo teacher (Deposition of Woodrow Campbell, intervenor's Exhibit 1, at pp. 9–10; Evans' Deposition, intervenor's Exhibit 4, at pp. 14–15; Walters' Deposition, intervenor's Exhibit 16, at p. 29). The team teachers cooperate in the formation of course outline, teaching, and assignments, but each teacher is responsible for the grading of the students from his or her own school (Deposition of Willa Johnson, intervenor's Exhibit 2, at p. 9; Deposition of Emma Wheathersby, intervenor's Exhibit 3, at p. 7; Deposition of Ella Johnson, intervenor's Exhibit 12, at p. 12; Deposition of William Michael Green, intervenor's Exhibit 15, at p. 11).

The salutariness of this program, if not evident in the segregated nature of the

---

10. The 1973 order set up the tri-zone plan and required, *inter alia*, that there be no duplication of required courses or of vocational home economics or agribusiness in grades 10–12 at Marengo and Sweetwater; that the required courses of English, Social Studies, and Physical Education be equitably allocated between the two schools; and that courses in grades 7–9 at Sweetwater and Coxheath be equitably allocated to the extent that there be no course duplication in these grades. *Lee v. Marengo County Board of Education*, Civil Action No. 5945–70–H (S.D.Ala., July 16, 1973).

11. Although the Superintendent of the Board has conceded that the primary responsibility

for the course-sharing program is his (Deposition of Fred Ramsey, intervenor's Exhibit 18, at p. 15), the evidence is clear that day-to-day oversight was vested in the Principals at Marengo and Sweetwater High Schools.

12. Exhibit 1 to the deposition of J. J. Evans, intervenor's Exhibit 4, reveals the following breakdown of shared courses at Marengo and Sweetwater High Schools:

| Marengo High School | Sweetwater High School |
| --- | --- |
| 11th Grade Social Studies | 10th Grade English |
| 12th Grade Social Studies | 11th Grade English |
| 10th Grade Girls' Phys. Ed | 12th Grade English |
| 12th Grade Girls' Phys. Ed | 11th Grade Girls' Phy. Ed. |
| 10th Grade Boys' Phy. Ed. | 11th Grade Boys' Phys. Ed. |
| 12th Grade Boys' Phys. Ed. | |

program set out above, is made clear in the manner in which the course-sharing was made available. While the 1974 consent order was absolute, not leaving room for exceptions, it is clear that course-sharing program was conducted on an irregular, rather than daily, basis (Campbell deposition, intervenor's Exhibit 1, at p. 18; W. Johnson deposition, intervenor's Exhibit 2, at p. 15; Wheathersby deposition, intervenor's Exhibit 3, at p. 10; Green deposition, intervenor's deposition, Exhibit 15, at p. 8). Indeed, one team teaching deponent could not even recall the last time prior to the deposition that her class had participated in the course-sharing (Wheathersby deposition, intervenor's Exhibit 3, at p. 11). The decision with respect to whether courses will be shared on a particular day lies with the principals (Campbell deposition, intervenor's Exhibit 1, at p. 22; E. Johnson deposition, intervenor's Exhibit 12, at p. 13; deposition of Christopher Jenkins, intervenor's Exhibit 13, at p. 10; deposition of Eugene Grace, intervenor's Exhibit 14, at p. 10; Walters' deposition, intervenor's Exhibit 16, at p. 10; deposition of Cecil Kimbrough, intervenor's Exhibit 17, at p. 17), and such sharing has often been cancelled on the basis of inclement weather or school activities (Walters' deposition, intervenor's Exhibit 16, at p. 10). The evidence does not reveal why inclement weather might preclude bussing between the schools when it did not prevent the original transportation of the students to the school in the morning.

The Court also notes, as a matter of course, that there remained during the 1977–78 school year duplication of courses with respect to required courses at Marengo and Sweetwater High School (J. J. Evans' deposition, intervenor's Exhibit 4, at pp. 23–24; E. Johnson deposition, intervenor's Exhibit 12, at pp. 7–8; Walters' deposition, intervenor's Exhibit 16, at p. 34).

(b) Zone 2—The precise language of the 1974 consent order with respect to this zone is, in pertinent part, as follows:

All provisions of the July 16, 1973 order governing desegregation in grades 7–12 will continue in full force and effect.[13] Beginning in the 1974–75 school year, in the same manner as described above for Zone 1, all courses in grades 7–8 and all required and vocational courses in grades 9–12 in Marengo County High and Marengo County Training School (Amelia Love Johnson High School) are to be allocated so that entire grades will be bussed at one time and the combined students of both schools in that grade will be then broken down into integrated sections of not more than 35 students to each section.

While the Court finds the program adopted in Zone 2 more in line with what was intended by the 1974 consent order, this program also varies significantly from the terms of the order. Zone 2 also appears to employ voluntary course-sharing, at least with respect to those Marengo County High students who participated (Deposition of Ruth Stephens, defendant's Exhibit 1, at p. 9), although this assertion is contested by one principal who stated that all Marengo County High students participated (Deposition of Brad Stephens, intervenor's Exhibit 6, at p. 9). In light of the overall program adopted, the Court does not consider this to be a crucial issue.

There are few distinctions between the program in Zone 1 and that in Zone 2. The chief difference is that team teaching was not used in Zone 2; rather each composite class had one teacher who graded students from his or her own school and students from the other school (Deposition of Allie Lewis, intervenor's Exhibit 10, at p. 10; Deposition of Barbara Hildreth, intervenor's Exhibit 11, at pp. 11 & 13). In the selection of teachers, a student opting for a

---

13. The July 16, 1973 order required in this zone that, *inter alia*, there was to be no duplication of required courses or of vocational home economics or agribusiness in grades 9–12 and no duplication of courses in grades 7–8, with such

courses to be equitably allocated between the two campuses in Zone 2. *Lee v. Marengo County Board of Education*, C.A. 5945–70–H (S.D.Ala., July 16, 1973).

white teacher in one required course would receive a black teacher in the other required course (B. Stephens' deposition, intervenor's Exhibit 6, at p. 16). Another difference is an apparent lack of voluntariness of participation and equality of participation. While it is not clear whether all Marengo County High students are required to participate, as noted above, it is clear that only the most intelligent Johnson High students participate, and that they are required to participate (Deposition of Richard Coates, intervenor's Exhibit 7, at pp. 12–15). Principal Coates of Johnson High School revealed that his classes are divided, on the basis of grades, into "A" and "B" sections, and that only "A" section students, the brightest, were involved in the course-sharing (*id.* at 14 & 15).

In most other respects, there has been little difference between course-sharing in Zone 1 and in Zone 2. All required courses at the high school level were involved,[14] but not all of the junior high classes were shared (B. Stephens' deposition, intervenor's Exhibit, 6, at p. 12). The principals had primary oversight responsibility for the course-sharing provisions,[15] and dictated when the sharing was to occur (Deposition of Ruth Allen, intervenor's Exhibit 5, at p. 8; Deposition of James Alexander, intervenor's Exhibit 9, at p. 10). As in Zone 1, sharing has been cancelled upon the principal's order for weather or school activity reasons (Allen deposition, intervenor's Exhibit 5, at p. 12; Alexander deposition, intervenor's Exhibit 9, at p. 9). One final distinction between Zone 1 and Zone 2 is that it is clear that there was only one day of course-sharing during the 1976–77 school year (Lewis deposition, intervenor's Exhibit 10, at p. 9; Hildreth deposition, intervenor's Exhibit 11, at p. 17), although Principal Coates of Johnson stated that all English

classes in grades 7–12 were shared (Coates' deposition, intervenor's Exhibit 7, at pp. 30 & 37). Finally, it is clear that there was duplication of courses at Marengo County and Johnson High School in courses not involving the sharing program (Coates' deposition, intervenor's Exhibit 7, at p. 10; Lewis deposition, intervenor's Exhibit 10, at p. 7; Hildreth deposition, intervenor's Exhibit 11, at p. 8).

17. The findings to be extracted from these programs are neither extreme nor complex. The Board has not complied with the terms of the 1974 consent order or its 1973 progenitor. The lack of compliance results not from any improper intent on the part of the Board, but rather from a misunderstanding or misapplication of the terms of the prior orders. While the Court considered the terms to be straightforward and clear, the depositions of various individuals involved indicate a complete failure to grasp the essence of the Court's order. The Board superintendent considered the Zone 1 course-sharing provisions as aimed at making Sweetwater High School a majority black school (Ramsey deposition, intervenor's Exhibit 18, at p. 13). At least two principals viewed the class-sharing program as seeking a 50%/50% racial composition in the shared courses (Coates deposition, intervenor's Exhibit 7, at p. 9; Walters' deposition, intervenor's Exhibit 16, at p. 16). These conclusions were entirely incorrect. In order that further misunderstandings not occur, the remedy provisions of this decision, *infra,* contain specific responsibilities for the Board.

18. The purpose of the course-sharing order of 1974 was to attempt to provide Marengo County students with a desegregated education. Prior to the entry of this order, the Court made personal visits to each of the facilities maintained by the

14. Only a partial list of the courses shared in Zone 2 has been revealed by the evidence. The deposition of Richard Coates, intervenor's Exhibit 7, at pp. 18–24, reveals that the following courses were shared at the school under which they are listed:

| Johnson High School | Marengo County High School |
|---|---|
| 10th Grade English | 7th Grade English |
| 11th Grade English | 8th Grade English |
| 12th Grade English | 9th Grade English |
| | 11th Grade Social Studies |
| | 12th Grade Social Studies |
| | 10th Grade Phys. Ed. |
| | 11th Grade Phys. Ed. |

15. *See* Note 13, *supra.*

defendant Board to try to formulate a remedy providing desegregation through the use of existing facilities. Having viewed the facilities, the Court concluded that pairing of schools was not a viable remedy because of the nature of the facilities. Most of the schools were constructed as 1–12 facilities, and the internal facilities were equally so constructed. Most of the facilities are old and are not readily adaptable to alteration for the purpose of modifying the grade configuration therein. Since the Court was convinced that pairing of the schools themselves was not feasible from a facility standpoint, the course-sharing order was adopted as the most effective reasonable alternative desegregation technique. At the time that course-sharing was implemented, the Court was confident that its conclusions with respect to utilization of the facilities were shared by the Department of Justice. Apparently, the government has changed its mind.

Without admitting that the course-sharing provisions of the 1973 and 1974 orders have not been complied with, the Superintendent suggested in his testimony at trial that the course-sharing programs ought to be abolished. The suggestion is grounded in the fact that such sharing is no longer an effective desegregation tool in Zone 1 because Sweetwater High School is now majority black, and because the opening this year of the countywide vocational center in Linden and the subsequent transportation considerations raised by it make the continuation of the sharing both economically and logistically infeasible.

The opening of the vocational center will require the transportation of many students at all county schools to Linden at various times of the day and then return them to their respective schools later. The availability of buses for this endeavor will seriously hamper efforts to share courses, since Marengo High is eight miles from Sweetwater and Marengo County is one mile from Johnson, both requiring bussing. The scheduling and transportation problems involved in continued sharing would appear to be unsurmountable.

### D. Faculty Assignment

19. Under this contention, the government has alleged that the Board assigns its faculty to schools so as to reflect the race of students in attendance at each school in violation of prior orders of this Court and the three judge panel respecting faculty assignments. The terminal order of the three judge panel entered June 20, 1970, in adopting the plan proposed by HEW, provided, in pertinent part, that:

1. The principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or for White students. The district shall assign the staff described above so that the ratio of Negro to White teachers in each school, and the ratio of other staff in each, are substantially the same ratio as to the teachers and other staff, respectively, in the entire school system. . . .

20. Reports from the Marengo County Board of Education (intervenor's Exhibits 26–36) reveal the following figures with respect to student assignment in the Marengo County School System:

ZONE 1

| | Marengo | | | Sweetwater | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | B | W | % | B | W | % | B | W | % |
| March 1974 | 963 | 0 | 100/0 | 155 | 536 | 22/78 | 1118 | 536 | 68/32 |
| October 1974 | 739 | 0 | 100/0 | 632 | 485 | 43/57 | 1101 | 485 | 70/30 |
| March 1975 | 763 | 0 | 100/0 | 364 | 475 | 43/57 | 1127 | 475 | 70/30 |

| | Marengo | | | Sweetwater | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | B | W | % | B | W | % | B | W | % |
| October 1975 | 720 | 0 | 100/0 | 423 | 437 | 49/51 | 1143 | 437 | 72/28 |
| March 1976 | 731 | 0 | 100/0 | 425 | 440 | 49/51 | 1156 | 440 | 72/28 |
| October 1976 | 739 | 0 | 100/0 | 433 | 452 | 49/51 | 1172 | 452 | 72/28 |
| March 1977 | 748 | 0 | 100/0 | 436 | 460 | 49/51 | 1184 | 460 | 72/28 |

### ZONE 2

| | Marengo Co. | | | Amelia Johnson | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | B | W | % | B | W | % | B | W | % |
| March 1974 | 67 | 311 | 18/82 | 674 | 0 | 100/0 | 741 | 311 | 70/30 |
| October 1974 | 173 | 303 | 37/63 | 673 | 0 | 100/0 | 846 | 303 | 74/26 |
| March 1975 | 191 | 304 | 39/61 | 695 | 0 | 100/0 | 886 | 304 | 74/26 |
| October 1975 | 169 | 328 | 34/66 | 694 | 0 | 100/0 | 863 | 328 | 72/28 |
| March 1976 | 170 | 342 | 33/67 | 701 | 0 | 100/0 | 871 | 342 | 72/28 |
| October 1976 | 142 | 315 | 31/69 | 678 | 0 | 100/0 | 820 | 315 | 72/28 |
| March 1977 | 143 | 322 | 31/69 | 690 | 0 | 100/0 | 833 | 322 | 72/28 |

### ZONE 3

| | John Essex | | |
|---|---|---|---|
| | B | W | % |
| March 1974 | 632 | 0 | 100/0 |
| October 1974 | 613 | 0 | 100/0 |
| March 1975 | 520 | 0 | 100/0 |
| October 1975 | 533 | 0 | 100/0 |
| March 1976 | 506 | 0 | 100/0 |
| October 1976 | 436 | 1 | 100/0 |
| March 1977 | 441 | 1 | 100/0 |

The reports reflect that Marengo High in Zone 1, Marengo County Training (Amelia Johnson) in Zone 2, and John Essex in Zone 3 are all-black schools and have been since

the 1974 orders, while Sweetwater and Marengo County High Schools, white schools under the *de jure* dual system, remain majority white.[16]

21. The same reports reveal the following breakdown by race of faculty members during the same period:

Zone 1

| | Marengo | | | Sweetwater | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | B | W | % | B | W | % | B | W | % |
| March 1974 | Not Available [17] | | | | | | 57 | 28 | 67/33 |
| October 1974 | Not Available | | | | | | 52 | 30 | 63/37 |
| March 1975 | Not Available | | | | | | 53 | 30 | 64/36 |
| October 1975 | 36 | 1 | 97/3 | 17 | 29 | 37/63 | 53 | 30 | 64/36 |
| March 1976 | 37 | 0 | 100/0 | 17 | 29 | 37/63 | 54 | 29 | 65/35 |
| October 1976 | 37 | 0 | 100/0 | 17 | 29 | 37/65 | 54 | 29 | 65/35 |
| March 1977 | 37 | 0 | 100/0 | 17 | 28 | 38/62 | 54 | 28 | 66/34 |

Zone 2

| | Marengo County | | | Amelia Johnson | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | B | W | % | B | W | % | B | W | % |
| March 1974 | Not Available [18] | | | | | | 41 | 17 | 71/29 |
| October 1974 | Not Available | | | | | | 44 | 21 | 68/32 |
| March 1975 | Not Available | | | | | | 44 | 21 | 68/32 |
| October 1975 | 7 | 20 | 26/74 | 37 | 0 | 100/0 | 44 | 20 | 69/31 |
| March 1976 | 7 | 20 | 26/74 | 37 | 0 | 100/0 | 44 | 20 | 69/31 |
| October 1976 | 6 | 21 | 78/22 | 37 | 0 | 100/0 | 43 | 21 | 67/33 |
| March 1977 | 6 | 21 | 78/22 | 37 | 0 | 100/0 | 43 | 21 | 67/33 |

16. The Marengo County Superintendent is of the opinion that Sweetwater is now majority black (Testimony of Fred Ramsey on 5–8–78, Transcript at p. 14). While this may be true for the 1977–78 school year, it is not indicated by any of the records presently before the Court.

17. The Board listed only the total number of teachers at Coxheath, Sweetwater, and Marengo High without an individual breakdown until the Board report of October, 1975.

18. The Board reported only the total number of teachers at Marengo County High and Johnson High without an individual breakdown until the report of October, 1975.

Zone 3

| | John Essex | | |
|---|---|---|---|
| | B | W | % |
| March 1974 | 26 | 5 | 84/16 |
| October 1974 | 28 | 4 | 87/13 |
| March 1975 | 28 | 4 | 87/13 |
| October 1975 | 27 | 5 | 86/14 |
| March 1976 | 27 | 5 | 86/14 |
| October 1976 | 25 | 3 | 89/11 |
| March 1977 | 25 | 3 | 89/11 |

A simple viewing of figures would tend to indicate that Marengo High, Johnson High, and John Essex, traditionally black under the *de jure* segregated system, remain identifiable as black schools by the composition of their faculties. Similarly, the figures with respect to Sweetwater High and Marengo County High indicate that these traditionally white schools are still identifiable as such. This alone violates the terms of the 1970 terminal order. Additionally, however, the figures reveal a violation of the second portion of the assignment provisions in that it is clear that no effort has been made to make the ratio of blacks to white at each school substantially similar to the ratio of the system as a whole. The existence of two schools with predominantly white faculties in a system that has a 70%/30% black faculty to white faculty ratio is sufficient to negate any argument that the Board has complied.

One of the major reasons underlying this violation of the terminal order has been the lack of adequate supervision by the Board. In questions of faculty assignment, the Board gives a great deal of responsibility to the principals at each school and to the local trustees (Ramsey Deposition, intervenor's Exhibit 18, at pp. 26–28). The principal or the trustees recommend to the Superintendent, who passes the recommendations on to the Board. Such recommendations are generally accepted by the Board. While this process itself is not improper, the Board's usage of it to evade the requirements of the 1970 terminal order certainly is.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this lawsuit and the parties hereto by virtue of Title 42, U.S.C.A., §§ 1983 and 2000a–6. As with the Findings of Fact above, considerations of clarity and conciseness dictate that the Conclusions of Law with respect to each issue be entered separately.

*A. Transportation*

2. The Court is of the opinion that the defendant Board is in violation of prior orders of this Court respecting the transportation of students in at least three respects. First, the evidence has made it clear that buses serving Marengo County High School in Zone 2 are crossing attendance zone lines and transporting to that school students who should properly be attending John Essex in Zone 3. Additionally, it is clear that Zone 1 buses are picking up Zone 2 students in the Magnolia, Hampdon, and Moores Valley area and transporting them to Marengo High School in Zone 1. The crossing of zone lines is in direct violation of prior orders of this Court and cannot

be continued.[19] A second area of violation results from the segregation of students on the school bus driven by Ruth Allen. It is inconceivable that a bus route in a system that is 80% black could, without preconceived effort, have all white passengers. Since transportation is a basic component of education in rural counties such as Marengo County, the Court is convinced that all students must be transported on a nonsegregated and otherwise nondiscriminatory basis. *See Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211, 1218 (5th Cir. 1970). A final violation revealed by the evidence relates to the overlapping of bus routes in both Zones 1 and 2. It is clear that in Zone 1, the buses travel many miles more than is necessary, since the Sweetwater routes cover all of the attendance zone and the Marengo routes do the same. The apparent intent behind the extensive routes is to achieve minimal desegregation on some buses, leaving most others all black (*See, e. g.,* Alexander Deposition, intervenor's Exhibit 9, at p. 12; Kimbrough Deposition, intervenor's Exhibit 17, at p. 6). It is clear that but for these overlapping routes there would be no all-black schools in Marengo County.[20]

### B. Course-Sharing

3. The findings of fact set out above demonstrate clearly that the defendant Board has made no substantial effort at compliance with prior court orders dealing with course-sharing, but rather have implemented programs aimed at results not intended by this Court. Beyond this, it appears from the Superintendent's testimony that future course-sharing would be impractical in light of the opening of the area vocational center. In view of this, and in view of the remedy adopted with respect to student assignment, *infra,* the Court is of the opinion that these violations need not be remedied, and that past orders of this Court requiring such sharing are due to be and the same are hereby RESCINDED.

### C. Fidelity Assignment

4. There is no question but that the faculty assignment portion of the 1970 terminal order has not been complied with to the extent that the Board appears to have engaged in racially motivated considerations in making its assignments. Such procedures, intentional or otherwise, violate the terminal order and the dictates of *Singleton v. Jackson Municipal Separate School System,* 419 F.2d 1211, 1218 (5th Cir. 1970), and must be remedied.

### REMEDY

The Findings of Fact and Conclusions of Law set out above have convinced the Court that judicial intervention in the affairs of the Marengo County Board of Education is required. The evidence presented to the Court is conclusive that the Board has done little in complying with the orders of this Court aimed at providing a unitized, desegregated school system. Indeed, the posture of the defendant Board can best be characterized as "obdurately obstinate," an attitude less than novel in this judicial dis-

---

**19.** The Court notes that not only has the Board been guilty of failing to respect the attendance zone lines, but further does not believe the Court meant what it said when the lines were drawn. Testimony of the Superintendent (Ramsey Deposition, intervenor's Exhibit 18, at pp. 7–8) indicates that he did not conceive of there being any specific boundaries in the county system and that student assignment was based on tradition, with students in any given area attending the school that has always served that area. However, in view of the remedy adopted, *infra,* rescinding the use of zone lines, the Court notes that such violations will not be able to occur in the future.

**20.** Whether the white students would attend the majority black schools is a separate question which, in light of this Court's experience with the Wilcox County School System, would most probably be answered in the negative. *See United States v. Wilcox County Board of Education,* Civil Action No. 3934–65–H (S.D. Ala.). Thus the Court faces limited options: some desegregation through artificial maintenance of majority white schools in a majority black system; or complete segregation to the extent that the system will have only black students. In view of the prevailing law in the Fifth Circuit, *e. g., Lee v. Tuscaloosa City School System,* 576 F.2d 39 (5th Cir., 1978), the first alternative is no longer open to this Court since the maintenance of such schools precludes a unitary system.

trict. *See, e. g., United States v. Wilcox County Board of Education,* 494 F.2d 575, 580 (5th Cir. 1974). Were this strictly a question of this Court weighing the performance of the Board in light of past orders, it would be simple to conclude that the Board should receive failing marks. However, the Court's task is not so simple, for having concluded that the Board has failed to effectively desegregate its schools, and with the evidence making it patently clear that in the absence of strong and convincing court action no such effective desegregation shall be forthcoming, and in light of the Board's contention that the prior plan is now infeasible, it is incumbent upon this Court to adopt and implement a new plan for the Marengo County schools that can be strictly enforced. Such a conclusion should not be read as an abdication of this Court's view that the 1974 plan was a proper desegregation technique, but rather that the ineffective assistance of the Board has dictated the imposition of new remedial action.

The litigants have been of little aid to this Court in this respect. The Board has continually demonstrated its disinclination to implement effective desegregation policies beyond the superficial program now existing under which all white students and some black students are provided, to some extent, a desegregated education. The government, on the other hand, while recognizing fully the problem confronting the Court, has come forward with a desegregation plan that does not, in this Court's experience, promise to work. Whether it results from animosity between the parties herein or overlitigiousness, the Court is of the opinion that the opposing forces have lost sight of the ultimate question, the fundamental right to education of school children.

The Court begins its analysis with the fundamental rule that equal educational opportunity in the public schools must be afforded to all children, regardless of their race or color. *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed.2d 873 (1954); *United States v. Jefferson County Board of Education,* 372 F.2d 836 (5th Cir. 1966). The objective sought, and one that this Court is convinced the litigants herein have lost sight of, is to eliminate from all public schools all vestiges of state-imposed segregation so that all students have an equal opportunity to obtain a nondiscriminatory education. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 402 U.S. 39, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. County School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Monroe v. Board of School Commr's of the City of Jackson,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). The burden of effectuating such a desegregated system rests first with the school board, *Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1973); *Monroe, supra;* but where, as here, the school board has defaulted on its obligation to desegregate its schools, the Court must intervene to preserve fundamental rights. *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Davis v. Board of School Commr's of Mobile County,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). Accordingly, it again falls upon this Court to effectuate a workable plan for Marengo County.

In developing a desegregation plan the Court is to be guided by equitable principles. *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), *citing Brown v. Board of Education,* 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown,* II). Chief Justice Burger, in *Milliken,* required that in applying such equitable principles, the Court be cognizant of three factors:

In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and the scope of the constitutional violation. The remedy must therefore be related to "the *condition* alleged to offend the Constitution . . ." *Milliken* I, [418 U.S.], [717] at 738, 41 L.Ed.2d 1069, 94 S.Ct. 3112. Second, the decree must indeed be *remedial* in nature, that is, it must be designed as nearly as possible "to restore the victims of discriminatory conduct to the position they would have oc-

cupied in the absence of such conduct." *Id.* at 746, 94 S.Ct. 3112, 41 L.Ed.2d 1069. Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.

433 U.S. at 280, 97 S.Ct. at 2757, 53 L.Ed.2d at 755–56 (citation and footnotes omitted) (emphasis in original). Beyond this the Court is required to adopt a plan that realistically promises to work. *Davis, supra,* 402 U.S. at 38, 91 S.Ct. at 1292, 28 L.Ed.2d at 581, *citing Green, supra,* 391 U.S. at 439, 88 S.Ct. at 1694, 20 L.Ed.2d at 724. The effectiveness of any plan is debatable until some period of time has passed after imposition, but this Court is convinced that hindsight can be just as effective a tool as foresight, so the plan that the Court adopts today, *infra,* is predicated to a great extent upon this Court's experience with desegregation in this and other systems.

Since 1971 this Court has struggled to find a solution to the desegregation problems applicable to Marengo County. Personal visitations have been made to most, if not all, of the educational facilities in the county, so the Court is intimately familiar with the facility capabilities. The attributes and shortcomings of each facility have been noted and the Court has struggled long hours with members of the educational establishment as well as the attorneys in an effort to effectuate a solution. This county is a rural county within the true meaning of that term. Besides the cities of Linden and Demopolis, which have their own city school systems, Thomaston is the largest urban area, having a population of less than 900. Myrtlewood, served largely by the Linden City system, has a population of under 350. Sweetwater has 250 residents, and from there the concentration of population drops dramatically. You can literally ride for miles and not see any evidence of human habitation. The ratio of black to white in the county, as reflected by the student population in the public schools, is 80% black and 20% white. There are presently six public schools serving the county school children. This demographic situation is crucial in understanding the task confronting the Court in effectuating a remedy in this case.

Before effectuating a remedy, it is incumbent upon the Court to consider the relative efficacy of all available desegregation techniques. *Davis, supra,* 402 U.S. at 37, 91 S.Ct. at 1291, 28 L.Ed.2d at 581, *citing Swann, supra,* 402 U.S. at 22–31, 91 S.Ct. at 1279–1283, 28 L.Ed.2d at 570–75. The remedies available for this task, as mentioned above, are limited only by what promises realistically to work.

The technique suggested by the government calls for the pairing of schools in Zones 1 and 2. This technique, which seeks to achieve desegregation by combining various grades of various schools, has frequently received endorsement in this judicial circuit. *See, e. g., United States v. Columbus Municipal Separate School District,* 558 F.2d 228 (5th Cir. 1977); *Lee v. Demopolis City School System,* 557 F.2d 1053 (5th Cir. 1977); *United States v. Texas Education Agency,* 512 F.2d 896 (5th Cir. 1975); *Darville v. Dade County School Board,* 497 F.2d 1002 (5th Cir. 1974); *Lee v. Macon County Board of Education,* 448 F.2d 746 (5th Cir. 1971). Indeed, pairing was, to a limited extent, the essence of the remedy ordered in this system by this Court's decrees of 1973 and 1974. That plan was ineffectual largely due to the lack of interest on the part of the School Board. The plan proposed by the government has certain redeeming values, most notably that transportation routes presently in use would not require substantial alteration and that most students would have to go no further to attend schools this year than they did in the past school year. The Court detects only two flaws in the government's plan, but the flaws are of such magnitude that the Court is convinced that such plan does not promise realistically to work, as required by *Davis* and *Green, supra.* The first problem lies in the size and nature of the facilities involved in the proposed pairing. In Zone 1, the government would house students in grades K–3 (382 students) and 10–12 (378 students) in the Marengo High School facility, with

students in grades 4–6 (377 students) attending the Sweetwater High facility and students in grades 7–9 (394 students) attending Sweetwater Junior High (Coxheath). According to the government's capacity figures, the authority for which is uncited, such pairing would result in overcrowded conditions only at Sweetwater Junior High School. What the government fails to assess in its post-trial brief suggesting the pairing, however, is the effect of using the Marengo High facility, ostensibly constructed for grades 1–12, as a K–3 and 10–12 facility. Assuming *arguendo* the validity of the government's capacity figures, the Marengo High facility was constructed with a view toward serving approximately 200 students in grades 10–12. There is no evidence in the record, nor can the Court conclude from its visitation of the facility, that such facility can effectively serve 378 students at those grade levels. The same problem results in Zone 2, where the government seeks to make the Marengo County High School facility, originally built to house grades 1–12, a 10–12 facility. Such pairing would, in the words of the Superintendent, amount to no more than "storing bodies," and would not be in the best interests of sound educational administration. A second, more compelling, problem apparent to the Court is the distinct possibility of white flight in the wake of such pairing. The government's statistics reveal that pairing, even if available in view of the present facilities, would result in each school in Zones 1 and 2 being about 30% white and 70% black. From this Court's experience, *see United States v. Wilcox County Board of Education,* Civil Action No. 3934–65–H (S.D.Ala.), such a student assignment ratio would result in the exodus of a large part, if not all, of the white students from the Marengo County School System. While this Court recognizes that fear of potential "white flight" cannot lie as the basis for failure to effectively desegregate a school system, *United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 491, 92 S.Ct. 2214, 33 L.Ed.2d 75, 81 (1972), there is no question but that the choice of one constitutional plan over another may be predicated upon an intent

to minimize the effects of any white boycott. *Stout v. Jefferson County Board of Education,* 537 F.2d 800, 802 (5th Cir. 1976). The recent teachings of *Regents of the University of California v. Bakke,* —— U.S. ——, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) indicate the importance of a diverse student body, although that decision is certainly distinguishable as dealing with a medical education as opposed to elementary or secondary education. In any event, before this Court will allow the Marengo County School System to degenerate into a one race system offering white students nothing and black students little more than was available under the dual system, the Court intends to make full use of its powers of experimentation to seek to achieve a desegregated and unitary system in which both races will participate. *See United States v. Montgomery County Board of Education,* 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). On this basis, and on the probability that pairing would overtax the existing facilities, the Court is of the opinion that the pairing plan suggested by the government is not the appropriate plan.

A second remedial alternative is attendance district zoning. *See Youngblood v. Board of Public Instruction of Bay County,* 430 F.2d 625 (5th Cir. 1970); *Lee v. Macon County Board of Education,* 429 F.2d 1218 (5th Cir. 1970); *Mannings v. Board of Public Instruction of Hillsborough County,* 427 F.2d 874 (5th Cir. 1970); *Ellis v. Board of Instruction of Orange County,* 423 F.2d 203 (5th Cir. 1970). This remedy is presently in force in most of the systems within this Court's jurisdiction, *see, e. g., Lee v. Dallas County Board of Education,* Civil Action No. 5945–70–H (S.D.Ala., March 3, 1978), and was the remedy prescribed for the Marengo County System by the terminal order of the three judge panel. The Court considered this remedy in connection with the matter *sub judice,* and even went so far as to draw tentative sub-zone lines creating two attendance zones in both Zones 1 and 2. The advantages of this remedy would be similar to those made available by the pairing proposal *supra.* Additionally, it is not clear that such a remedy would overtax the

facilities to the extent that pairing would. However, since the splitting up of the white students in the two zones would most likely lead to the white exodus mentioned above, the Court cannot reasonably accept this plan any more than it could accept pairing as a plan that realistically promises to work.

The Court conceives of each of the foregoing desegregation tools as efforts at social engineering. Social engineering under the demographic circumstances presently existing in Marengo County will not work because not only do you close the system to a large number of students who desire and need a public education, but you provide the basis for the disestablishment of the public school system as a whole since you remove a necessary underpinning of that system— public support. Whoever conceived the idea of social engineering in the education area could not have possibly conceived the ultimate result as being the abolition of public education for the white race and the establishment of all-black schools. It is not practical to give each school in an 80% black system a sprinkling of whites in order to be able to say social engineering works and each school is integrated. You can say that the schools are desegregated, however, by giving each student an equal opportunity to obtain an equal education.

The ultimate solution to the desegregation efforts in Marengo County is the establishment of a central school in the county to which all students shall be assigned. Indeed, this was an alternative proposed by the Board in the early 1970's. The problem with this is that Marengo County is not a rich county and cannot undertake this endeavor unaided. Therefore, the Court is convinced that if social engineering is to be allowed to take its course in Marengo County then a central facility must ultimately be established at such time as the United States government, which appears to be the only party having objections to the past efforts of the Marengo County School Board, provides financial assistance to the state and county to make such construction feasible. The Court suspects that such contribution will be a long time coming. However, in the interest of speeding up the day

when a countywide facility can be constructed, the Court hereby orders the defendant Board to come forward with a plan by no later than November 17, 1978, by which such a facility might be constructed and a report reflecting the results of its efforts at obtaining the necessary funding.

Until a central facility can be constructed the Court elects to take a constitutional approach to the problem—all students presenting themselves to the educational processes of Marengo County shall have an equal opportunity to obtain an education of equal quality to that of any other students in the system which the Board must provide at any institution or establishment that they elect to attend that the School Board can presently afford to operate. This remedy is pure and simple freedom of choice, which, when combined with completely desegregated faculties, desegregated transportation facilities, and facilities maintained on a nondiscriminatory basis, should combine to provide each student with an educational opportunity equal to that of each and every other student within the system. This possible novel approach today in this system will have no deleterious effect on the desegregation efforts elsewhere for the reason that if not adopted the system will end up an all one race system as in Wilcox County where blacks now are bussed 100 miles from an all-black area to an all-black school.

The freedom of choice plan has enjoyed considerable disrepute in the past ten years, commencing with *Green v. County School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and its companion cases, *Raney v. Board of Education of the Gould School District,* 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), and *Monroe v. Board of Commissioners of the City of Jackson,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). In *Green,* the Court did not hold freedom of choice unconstitutional, but found rather that it was impermissible only to the extent that it failed "to undo segregation." 391 U.S. at 440, 88 S.Ct. at 1695, 20 L.Ed.2d at 725. The Court noted that such plans had been

largely ineffective as a desegregation tool, but opined that "there may well be instances in which it can serve as an effective device." *Id.* The words of Justice Brennan, speaking for an unanimous Court, are quite instructive:

> Where it offers a real promise of aiding a desegregation program to effectuate conversion of a state-imposed dual system to a unitary, nonracial system there might be no objection to allowing such a device to prove itself in operation. On the other hand, if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, "freedom of choice" must be held unacceptable.

*Id.* at 440–41, 88 S.Ct. at 1696, 20 L.Ed.2d at 725. Since this Court is convinced that any other desegregation technique promises only a white boycott of the public school system in Marengo County and a return for black students to a system not substantially different from that afforded them under the dual system, the Court is of the opinion that freedom of choice ought to be implemented in Marengo County so that its effectiveness as a desegregation tool may be properly assessed. In view of the past lack of cooperation that this Court has received from the Board, the plan will have to be tightly monitored, but the Court is confident that proper safeguards can be afforded.

Accordingly, it is the order of this Court that, commencing with the 1978–79 school year, and for each year thereafter until directed otherwise by this Court or until the completion of a central facility, each student attending schools within the Marengo County School System shall attend the school of his choice, up to facility capacities. All zone lines previously drawn by this Court are hereby abolished, and the Board will provide to each student requisite transportation to the facility of that student's choice. The Board will mail to each student a form listing the schools which may be attended, and each student shall return the form to the Board listing a first, second, and third choice. The following capacity limits will be observed in each school:

| School | Grades | Capacity |
| --- | --- | --- |
| Marengo High School | K-12 | 780, 60 per grade |
| Sweetwater High School | 1-6, 10-12 | 540, 60 per grade |
| Coxheath Junior High | 7-9 | 270, 90 per grade |
| Johnson High School | K-12 | 845, 65 per grade |
| Morengo County High | K-12 | 390, 30 per grade |
| John Essex High School | K-12 | 585, 45 per grade |

The Court expects that this plan will lead to somewhat of an inverse white flight in that most elections by students will be racially motivated. Such elections may well result in any of the schools receiving more elections than its facility can maintain. In the event this occurs, the names of students selecting that particular facility will be drawn at random during a meeting of Board and government attorneys. Those students not afforded their first choice will be placed in the pool of applicants for their second choice, and so on. Any conduct by the Board, or any of its agents, which might encourage any student to opt for one school as opposed to any other will be deemed a violation of this order. After the first year that the program has been in effect, a student will continue to attend the school chosen this year, with Coxheath Junior High and Sweetwater High School to be considered one school for this purpose.

With respect to faculty assignments, the Board is hereby ordered, under penalty of

contempt, to comply with prior orders of this Court so that the racial balance of the faculty and staff at each school in the system is the same. As was the case previously, any teacher refusing a transfer may be required to seek employment elsewhere. On this point, the Board is hereby ORDERED to report to the Court immediately upon receipt of this decision its proposed faculty assignments for the 1978–79 school year, and the Board may expect court ordered transfers if the assignments are not in compliance with prior orders.

Finally, with respect to transportation, the Court orders the Board to come forward with a desegregated, nondiscriminatory transportation plan for the bussing of students. The Court does not expect to find any all-white buses in the system without a compelling explanation, and the Board is ordered to end its practice of overlapping its routes to so segregate its buses. Any violation of this order will be dealt with sternly. Such plan should be filed with the Court as soon as possible, so that it may be approved for the coming school year.

All prior orders of this Court not touching on student assignment, including majority to minority transfer provisions, remain in full force.

The Board is hereby directed to report to the Court within two weeks of receipt of this decision the form to be used by the Board in eliciting the school selections from the students. Thereafter the Board is to provide the Court with a breakdown showing the number of elections, by grade, made for each school. The Board is reminded that any default on its part, or on the part of its agents, with respect to this desegregation plan will subject the Board to the contempt powers of this Court, and the Court intends to carefully monitor this program so that freedom of choice does not become illusory. *Cf., United States v. Jefferson County Board of Education,* 372 F.2d 836 (5th Cir. 1966).

The Court will hold a hearing on this matter at 9:00 a. m. on Friday, August 25, 1978, in the United States Courthouse, Selma, Alabama, at which time the Court will consider any suggestions the parties may have to further the purposes of this program, and at which time the Court will expect to hear from the Board on its progress thus far.